# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Gay-Lesbian-Bisexual-Transgender Pride/Twin Cities, d/b/a Twin Cities Pride<br><br>Plaintiff,<br><br>vs.<br><br>Minneapolis Park and Recreation Board<br><br>Defendant. | **Case No.:** _____<br><br><br>**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER** |

## INTRODUCTION

This motion presents a narrow but urgent and important matter, one with significance to hundreds of thousands of people.   Two days from today, on Saturday, June 26, and again on Sunday, June 27, Plaintiff Gay-Lesbian-Bisexual-Transgender Pride/Twin Cities ("Twin Cities Pride") will hold the 38th Annual Twin Cities Pride Festival in Loring Park in Minneapolis.  Over 200,000 people are expected to visit Loring Park to attend the Pride Festival during these two days.

Twin Cities Pride asks this Court to issue a narrowly tailored order that requires the Minneapolis Park and Recreation Board (the "Park Board") to support and assist Twin Cities Pride in protecting its First Amendment rights by:  (1) prohibiting an anti-gay activist named Brian Johnson (and any other person or organization) from distributing written materials, products, or tangible objects of any kind, outside of a vendor or exhibitor booth authorized by Twin Cities Pride and (2) prohibiting all signage not

1

authorized by Twin Cities Pride that is displayed or carried by persons within the legal boundaries of Loring Park (including its internal and perimeter pathways).

This request for emergency relief is necessary because, as it has thirty-three times before, the Park Board has issued a permit to Twin Cities Pride to use Loring Park for the annual Twin Cities Pride Festival, which celebrates gay, lesbian, bisexual and transgender ("GLBT") history and affirms the rights of GLBT people to celebrate their lives. However, in an unprecedented and unexpected turn, the Park Board has also allowed a person with a distinct anti-gay message, Brian Johnson, unlimited permission to distribute materials and display signs anywhere in Loring Park during the Pride Festival.

Ever since a meeting on June 8, 2010, when the Park Board stunned Twin Cities Pride by revealing its letter, dated April 26, 2010, authorizing Johnson to distribute materials and display signs in Loring Park, Twin Cities Pride has been trying to resolve this dispute quietly. However, the Park Board refused to reconsider its position, even after Twin Cities Pride explained to the Park Board that Johnson's application to participate in the Festival was denied both last year and this year because of deceit and incompatibility with the message of the Festival and reminded the Park Board that Johnson was arrested for disrupting the Pride Festival last year. The Park Board refused to reconsider, even after Twin Cities Pride pointed out that Johnson and others like him are free to attend the Pride Festival along with the other hundreds of thousands of expected visitors, but cannot become itinerant, unaccountable de facto exhibitors by handing out materials and displaying or carrying signs wherever they wish. The Park

Board refused to reconsider, even when Twin Cities Pride pointed out that Johnson and others like him could dispense their materials and display their signs across from Loring Park on any city sidewalk. The Park Board even refused to reconsider when Twin Cities Pride called their attention to the controlling United States Supreme Court case on this issue: *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 115 S. Ct. 2338, 132 L.Ed.2d 487 (1995).

The Park Board's actions constitute a blatant violation of the principle set forth in *Hurley*: Twin Cities Pride cannot be forced to include a de facto exhibitor who distributes literature at the Pride Festival, especially one whose message is antithetical to Twin Cities Pride's own message within the boundaries and during the times in which Twin Cities Pride has obtained a permit to express its views. It is simply impractical to require Plaintiff to disclaim the message of moving de facto exhibitors (in this case, someone who is distributing literature outside of a booth). But the Park Board has made it clear in the last day that, if Brian Johnson attempts to become a de facto exhibitor at the Pride Festival, it will not assist or support Twin Cities Pride in having him or others like him removed from Loring Park.

Twin Cities Pride has published a clear application process along with guidelines and regulations for authorize Pride Festival sponsors, exhibitors, and vendors to operate booths, in order to promote its positive message of GLBT Pride, as well as to manage a very large and complex event with an almost all volunteer staff. The Park Board's refusal to support and assist Twin Cities Pride by excluding unauthorized –even hostile—de facto exhibitors such as Brian Johnson (persons who want to distribute material or

3

display signage outside of an authorized and assigned booth) is threatening Twin Cities Pride's ability to express its unambiguous message of GLBT pride as well as its basic ability to conduct the Pride Festival. Thus, Twin Cities Pride has no choice but to come to this Court, seeking temporary and urgent protection of its civil and constitutional rights.

## FACTS

This motion relies on the declarations of Amy Slusser ("Slusser Decl."), Dorothy "Dot" Belstler ("Belstler Decl."), and James "Jim" Kelley ("Kelley Decl.") filed concurrently with this motion and brief.

Gay-Lesbian-Bisexual-Transgender Pride/Twin Cities, d/b/a Twin Cities Pride ("Twin Cities Pride") is a nonprofit 501(c)(3) organization based in Minneapolis, Minnesota. Twin Cities Pride is an almost all volunteer organization that produces the annual Pride Celebration in the Twin Cities of Minneapolis and Saint Paul. The mission of Twin Cities Pride is "to commemorate and celebrate our diverse heritage, inspire the achievement of equality and challenge discrimination." Belstler Decl. ¶ 2.

The Minneapolis Park and Recreation Board of Commissioners ("Park Board") is an independently-elected, semi-autonomous body responsible for maintaining and developing the Minneapolis Park system to meet the needs of citizens of Minneapolis. Slusser Decl., Ex. D. The Park Board issues permits to the public for special events, such as private weddings, family picnics, community celebrations and fairs. Slusser Decl. Ex. E.

4

## I.     Twin Cities Pride Celebration

### A.     History of Pride Festival in Loring Park

The annual Twin Cities Pride Celebration consists of several events, but most notably the two-day Pride Festival, which is traditionally held the last full weekend in June. The Pride Festival has been held in Loring Park for 32 of the 37 years the Pride Festival has been held. The first local GLBT march, held in June 1972 to commemorate the Stonewall protests in New York City, was held in Loring Park. This march later evolved into a major event organized by Twin Cities Pride, which is now called the Ashley Rukes GLBT Pride Parade. The annual Pride Parade goes down Hennepin Avenue in downtown Minneapolis, and ends at the Pride Festival in Loring Park. The attendance at the combined Pride Celebration events has grown from approximately 50 attendees in 1972 to an estimated 480,000 in 2009. Approximately 200,000 of those attendees visited the Pride Festival. Belstler Decl. ¶ 4.

The Pride Festival attracts attendees from all around the upper Midwest. Many of these attendees come from rural areas and small towns that have no Pride parade or festival and where they are barraged with daily messages from family, associates, co-workers, and churches that homosexuality is sinful and dangerous. One young man explained his feelings of anticipation for the 2010 Pride Festival to a reporter of a local GLBT magazine: "There's a lot of friendships, and it's just really welcoming, and you don't feel like you have anything to be afraid of." Casey Merkwan, *Twin Cities Pride Festival Brings Usual Excitement With Some New Flair*, Lavender Vol. 16, Issue 393 at 20 (June 18-July 1, 2010). Slusser Decl., Ex. F.

### B.   Park Board Issues Permits for Special Events

Each year, Twin Cities Pride applies to the Park Board for a special use Permit (the "Permit") to hold the Pride Festival in Loring Park. Every year, the Park Board issues the Permit, charges facility fees, requires payment of a percentage of all sales and booth fees, and collects additional fees for the Park Police. In 2009, Twin Cities Pride paid the Park Board over $36,000 in permit fees, revenue shares from food and beverage sales, and other conditions to lease Loring Park for the duration of the Pride Festival. Belstler Decl. ¶ 6.   The Permit allows Twin Cities Pride to use Loring Park and the Loring Park Bandshell for the duration of the Pride Festival. The Permit also allows Twin Cities Pride to set up a beer garden within Loring Park. Twin Cities Pride is responsible for litter removal and cleanup, including providing dumpsters and cleaning portable toilets, at a cost of $7,000 per year. The Permit allows Twin Cities Pride to bring vehicles into Loring Park to set up tents and to provide and replenish supplies during the Pride Festival. The Permit also requires Twin Cities Pride to pay fees to ensure the presence of the Minneapolis Park Police. In addition to these fees, Twin Cities Pride pays $13,500 for insurance for the Festival grounds, including the perimeter pathways and sidewalks. Twin Cities Pride pays for a private security firm to guard the permit grounds overnight at a cost of $5,000 per year.  Belstler Decl. at ¶ 6.

### C.   Types of Participants in the Twin Cities Pride Festival (Sponsors, Exhibitors, and Vendors) and Rules for Participants

The Pride Festival attracts over 200,000 visitors and is planned, organized, set up, managed, and taken down largely by volunteers, who may include different individuals

from year-to-year. Belstler Decl. at ¶¶ 2 and 4. This makes for a complex and expensive event. Consequently, Twin Cities Pride has created three categories of official participants in the Pride Festival:

1.     "Sponsors" have the highest level of participation in the Pride Festival. (These official participants receive many benefits, including booth space and advertising through signage and other advertisements, in exchange for substantial in-kind or financial support of the Pride Festival. The Pride Festival Exhibitor/Vendor Guidelines make clear that an exhibitor or vendor may not claim or advertise "sponsorship" of the Pride Festival just by renting a booth. Belstler Decl., Ex. A.)

2.     "Vendors" sell products or solicit donations; and

3.     "Exhibitors" do not sell or solicit donations, but may display information about their organization or cause, take surveys of attendees, and distribute written materials or souvenirs (books, key chains, pens, pencils, fans, bags, etc.), which often express support for the message of GLBT pride.

Belstler Decl. at ¶ 5.  Even though they may not bring in as much revenue as sponsors, individual official exhibitors and vendors are seen as highly valued friends of the Pride Festival. Thus, organizations and individuals with authorized booths are listed in the Twin Cities Pride Annual Report as "Pride Season Supporters."  Belstler Decl. at ¶ 5.

Twin Cities Pride is very serious about the expressive parts of its mission. All sponsors, exhibitors and vendors, whether commercial, non-profit, religious, political, etc, must sign and affirm a statement the following non-discrimination statement:

> The Applicant affirms that they and/or their business/organization do not discriminate in hiring, employment, participation or services rendered based on the fact or perception of a person's race, color, creed, religion, national origin, ancestry, age, sex, sexual orientation, gender identity, domestic partner status, marital status, disability, or Acquired Immune Deficiency Syndrome or HIV status.

Belstler Decl., Ex. A; Kelley Decl. at ¶ 5. Applicants that do not affirm this statement are excluded from the Pride Festival. Kelley ¶ 6.

In addition, because of the responsibility it has for litter removal, crowd control, and insurance, Twin Cities Pride requires vendors and exhibitors to distribute materials in accordance with their vendor/exhibitor rules. The 2010 Guidelines state to all potential sponsors, exhibitors and vendors: "You must limit your activities at the Festival to those you state on your application, which must pertain to your organization/business. You must also limit the conduct of those activities to your booth space(s). *Sales or distribution of anything done by walking through the Festival grounds is not permitted.*" Belstler Decl. Ex. A. (emphasis in original).

These rules serve three essential and pragmatic purposes. First, limiting distribution of written and tangible materials to booths helps prevent littering throughout the Pride Festival grounds. Twin Cities Pride is responsible for cleaning up Loring Park after the Pride Festival. To this end, Twin Cities Pride requires those distributing materials at a booth to be responsible for cleaning up their discarded materials around their booths. Twin Cities Pride reserves the right to charge vendors and exhibitors a cleaning fee if their booth spaces are left damaged or in bad condition. Belstler Decl. at ¶ 8.

Second, limiting the distribution of materials, products, and samples to authorized and assigned booth locations assists in crowd safety and control. Some years, Pride Festival attendance exceeds 200,000 over the two-day Festival. It is crucial to limit distribution of materials to certain areas Loring Park so that the traffic flow of attendees is as smooth as possible.  If vendors or exhibitors are able to stand on the internal or perimeter pathways distributing materials, the crowds that gather to get a free key chain, disposable pen, informational pamphlet, or Bible can impede the arrival and access of other Festival attendees, security, police, or the staging and delivery of supplies to food and beverage or other vendors. (For example, vendors often require additional large deliveries of ice and beverages, which Twin Cities Pride must provide.)  Although city, state, and Park regulations, or nuisance or disorderly conduct law might provide grounds to move a particularly disruptive vendor, at that point it is too late; the traffic jam has happened and it is no consolation that the vendor can be told to move along. Pride personnel or Park police personnel may not even be able to easily get to the vendor who distributes a particularly popular "freebie" to a crowd. Belstler Decl. at ¶ 10.

Finally, exhibitor and vendor booth fees are a primary source of the revenue that allows Twin Cities Pride to carry out its mission. Under the terms of its Permit, Twin Cities Pride must give 10% of the revenue from food, beverage and other commercial booths to the Park Board.  Slusser Decl., Ex. A. In 2009, Twin Cities Pride approved 562 booths for $137,158.00 of revenue. Kelley Decl. at ¶ 7.  To date, Pride has approved 391 booths for $122,875.00 (as of June 17, 2010) for the 2010 Festival. Belstler Decl. at ¶ 5. As the vendor application and guidelines state, the booths are charged on a sliding scale

based on the applicant's size and commercial status. Twin Cities Pride attempts to make the Pride Festival accessible through a booth for any organization that wants to participate and whose message is consistent with the overall message and specific theme of the Pride Festival. Belstler Decl., Ex. A.

## II.    Brian Johnson's Anti-Gay Message

### A.    Brian Johnson has Disrupted the Pride Festival in the Past.

In 2009, Brian Johnson applied to have a booth at the Pride Festival. Twin Cities Pride denied his booth application because, when Jim Kelley, the 2009 Festival Manager, asked Johnson about his true opinions of GLBT people, he admitted he thinks GLBT are sinful and going to hell unless they seek salvation for their sins. Festival Manager Kelley singled out Johnson's application for scrutiny because he recalled previous complaints about Johnson and his family when Kelley was President of the Board of Directors of Twin Cities Pride. Kelley Decl. at ¶¶2, 3, 6. Unlike religious organizations that support GLBT pride, Mr. Johnson used the enticement of "free" materials, such as copies of the Bible, to initiate a conversation, which gave Johnson the vehicle to deliver his message that attendees must repent for the "sin of homosexuality." Kelley Decl. at ¶¶2, 3, 6. In previous years, Twin Cities Pride received complaints from attendees who felt ambushed by Johnson and his family. Kelley Decl. at ¶¶2, 3, 6.

When they approached Johnson's booth,  Festival attendees may have thought they were going to interact with an affirming religious organization and were going to get a free Christian Bible as a result (and many GLBT persons also identify as Christian, *see*, *e.g.*, www.soulforce.org). Instead these attendees were harassed by Johnson and his

family, who told them they were sinners and going to hell. This message is diametrically opposed to the message of the Pride Festival.

Despite the fact that Twin Cities Pride denied his booth application, on June 27, 2009, Johnson and two members of his family came to Loring Park and attempted to distribute materials outside of a booth, in clear violation of the exhibitor vendor guidelines that they had previously signed and acknowledged. Kelley Decl. at ¶¶ 6, 8, and Ex. A. The Minneapolis Police Department asked Johnson and his party to move their boxes of materials, including Bibles, off the Pride Festival grounds to the city sidewalk on the other side of Harmon Place, where they would be free to distribute the materials and interact with Festival attendees off the permitted grounds. Johnson and his family refused to do so. The Minneapolis Police Department then arrested him and ejected him from Loring Park for trespassing and refusing to follow their instructions. Kelley Decl. at ¶ 8.

**B.   The April 26, 2010 Park Board Directive Allows Brian Johnson Special Access to Distribute Materials at the 2010 Pride Festival.**

On April 5, 2010, Brian Johnson, through his counsel the Alliance Defense Fund ("ADF"), sent a letter to the Park Board. ADF threatened the Park Board with litigation unless it allowed Mr. Johnson to enter the Twin Cities Pride Festival grounds to distribute materials. Slusser Decl., Ex. B. (In addition, Mr. Johnson applied again for an exhibitor booth at the 2010 Twin Cities Pride Festival. Twin Cites Pride again denied his application because of his history of misrepresentation, anti-gay opinion, and disruption.) Belstler Decl. at ¶ 11.

Without notifying Twin Cities Pride and despite their knowledge of Mr. Johnson's history of distributing materials outside of a booth without authorization, on April 26, 2010, the Park Board's attorney wrote to ADF advising them the Park Board "**will not** prevent Brain Johnson [sic] from entering Loring Park or its perimeter sidewalks on June 26th and June 27th 2010 during the Minneapolis Pride Festival ("Festival") to distribute literature, display signs, and speak to members of the public." Slusser Decl., Ex. C (emphasis in original). Although it cited to case law in the letter, the Park Board did not even mention the controlling Supreme Court case, *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 115 S. Ct. 2338, 132 L.Ed.2d 487 (1995).

In its hurry to avoid litigation with Brian Johnson, the Park Board failed in its public duty to protect Twin Cities Pride's First Amendment rights to control who can be a sponsor, exhibitor, or vendor in the Pride Festival—whether officially or de facto. The Pride Festival is an expressive event and its message is antithetical to Mr. Johnson's message that homosexuality is sinful. But even yesterday, the Park Board has affirmed that if Brian Johnson attempts to become a de facto exhibitor at the Pride Festival, it will not assist or support Twin Cities Pride in having him or others like him removed from Loring Park. Belstler Decl. at 13. Because of the Park Board's directives, de facto exhibitors who do not have a booth will not be limited to Mr. Johnson. Twin Cities Pride has received at least two different messages warning that at least three busloads of people will be coming to the Pride Festival to distribute literature, given the Park Board's advice to Brian Johnson and Twin Cities Pride's opposition to it. Belstler Decl., Ex. C.

## C.    Irreparable Injury

The Park Board intends to force Twin Cities Pride to allow Mr. Johnson to distribute his message of religious sin and condemnation by distributing "free" materials at the Pride Festival, displaying signs contrary to the message of the Pride Festival. The Park Board's actions are unconscionable and unprecedented in the 38-year history of the Pride Festival, and will cause irreparable injury to Twin Cities Pride and to the attendees who go to the Pride Festival for a few hours on two days a year in a small park to escape such messages of hate and condemnation.  Twin Cities Pride has twice decided Mr. Johnson should no longer be tolerated as an exhibitor at the Pride Festival because Mr. Johnson's message is in direct conflict with the core organizing principle of the Pride Parade and Pride Festival:  to commemorate and celebrate the diverse heritage of the GLBT community, to inspire the achievement of equality, and to challenge discrimination.  The Park Board's directives cause irreparable harm by unilaterally helping Mr. Johnson and others like him who distribute materials and post signate become de facto exhibitors.

It is not practical for Twin Cities Pride's volunteer safety and security staff (who must also respond to lost child problems, health problems, and a host of other issues) to monitor Mr. Johnson's distribution of literature to ensure that he is not personally littering or contributing to more litter as he roams around the park. Nor is it likely that Twin Cities Pride will be able to collect a cleaning fee from him, as it would an organization that rents a booth.  Finally, allowing Mr. Johnson the right to distribute

materials outside of a booth deprives Twin Cities Pride of the application fee it uses to defray the significant costs of obtaining a Permit.

## ARGUMENT

Injunctive relief is well suited for "a presently existing actual threat," *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982), as when the requesting party has or will suffer less tangible injuries that cannot be easily valued or compensated. *See Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371-72 (8th Cir. 1991). Federal Rule of Civil Procedure 65 sets forth the basis upon which a court may issue a temporary restraining order. Whether a temporary restraining order is an appropriate remedy is determined by a weighing of four factors:

> (1) the threat of irreparable harm to the movant in the absence of relief;
>
> (2) the balance between that harm and the harm that the relief would cause the other litigants;
>
> (3) the likelihood of the movant's ultimate success on the merits; and
>
> (4) the public interest.

*Dataphase Sys., Inc. v. CL Sys, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).

"The question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113. Even where "money damages are available to compensate for some harm" to the plaintiff, injunctive relief is available when plaintiff has suffered "other, less tangible injuries [that] cannot be so easily valued or compensated." *McLeodUSA Telecommunications Services, Inc. v. Qwest Corp.*, 361 F. Supp. 2d 912,

921 (N.D. Iowa 2005); *accord Glenwood Bridge*, 940 F.2d at 371-372 (8th Cir. 1991).

Although injunctive relief is an extraordinary remedy, *see Calvin Klein Cosmetics Corp.*

*v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987), and the party requesting a

temporary restraining order bears the "complete burden" of demonstrating the necessity

of such relief, *see Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987),

when that party meets each of the four *Dataphase* factors, injunctive relief should be

granted.

A.   **Twin Cities Pride and Pride Festival Attendees Will Be Irreparably Harmed if a Temporary Restraining Order is Not Issued.**

Here, irreparable harm will result if injunctive relief is not granted, and that harm

will not be compensable by money damages. *See Packard Elevator v. I.C.C.*, 782 F. 2d

112, 115 (8th Cir. 1986).

By its letter granting unlimited access to Brian Johnson to distribute materials as a

de facto exhibitor in Loring Park during the Pride Festival, the Park Board has forced

Twin Cities Pride to allow Mr. Johnson (1) to distribute his message of religious sin and

condemnation and  (2) to display signs contrary to the message of the Pride Festival. In

doing so, the Park Board has significantly eroded the meaning and value of a permit to

use Loring Park for an expressive purpose. The Park Board charges Twin Cities Pride

facilities fees, a percentage of total sales, a percentage of booth fees, and additional

security fees. The Park Board requires Twin Cities Pride to maintain Loring Park's

cleanliness and to work with the Minneapolis Park Police and the Minneapolis Police

Department and hire private security guards to maintain order. In order to comply with

these requirements, and in order to offset the permit fees, Twin Cities Pride developed a highly organized exhibitor and vendor application and guidelines that require approved vendors to distribute materials from a booth.

The Park Board has gutted those guidelines and safeguards by allowing an individual who advocates against the core message of Twin Cities Pride to distribute materials and use signs or displays at the Pride Festival outside of an authorized and assigned booth, without paying a Pride Festival application fee. By assuring Mr. Johnson that they will not stop him from entering Loring Park to distribute materials, the Park Board has chosen to protect the rights of a single speaker over the rights of the permit holder who paid for the right to express a message of affirmation and celebration. And the Park Board has made it clear within the last day that, if Brian Johnson attempts to become a de facto exhibitor at the Pride Festival, it will not assist or support Twin Cities Pride in having him or others like him removed from Loring Park.  Belstler Decl. at 13. The Park Board's actions will cause irreparable injury to Twin Cities Pride and to the attendees who go to the Pride Festival to escape such messages of hate and condemnation. Injunctive relief is the only remedy that will adequately address Plaintiff's and Pride Festival attendees' present and future injuries.

**B.      The Weighing of the Equities Results in the Issuance of the Temporary Restraining Order.**

The second *Dataphase* factor is a weighing of the relative harm the temporary restraining order would cause against the irreparable harm the movant would suffer absent the injunction. *See Dataphase*, 640 F. 2d at 114.

Here, the Park Board would suffer no harm from the temporary suspension of its direction to Brian Johnson. Johnson is still free to attend the Pride Festival and speak freely with attendees (as long as there he complies with the law). As it has for thirty-three years, and especially in 2009, the Park Board will not be injured by supporting and assisting Twin Cities Pride in removing unauthorized exhibitors or vendors who attempt to subvert the exhibitor and vendor application guidelines, application and fee. The fundamental purpose of any permit system has historically been the method to resolve competing uses of Loring Park or any other public forum. The Park Board cannot claim it is damaged somehow now, for the first time, if it cannot enforce its directive to Brian Johnson.

In contrast, the risk of irreparable harm to Twin Cities Pride and Pride Festival attendees is great. The purpose and mission of the Pride Festival is to commemorate and celebrate our diverse heritage, inspire the achievement of equality, and challenge discrimination. Twin Cities Pride should not be forced to subsidize messages that conflict with its purpose and mission. Festival attendees and their families should not have to suffer an "ambush" by a rogue exhibitor in the Festival who delivers a written or tangible anti-gay missive that goes against the core reason for the Pride Festival itself.

In addition, if Brian Johnson can become a de facto exhibitor at the Pride Festival, his example sets a devastating precedent. Others, and not necessarily just anti-gay de facto exhibitors, will follow his lead. According to the Park Board, no one has to be confined to a booth or pay the booth fee if they can carry enough of their written or tangible materials and signage along with them throughout the legal boundaries of Loring

Park. Twin Cities Pride has received at least two different messages warning that at least three busloads of people will be coming to the Pride Festival to distribute literature within the permit grounds, given the Park Board's advice to Brian Johnson and Twin Cities Pride's opposition to it. Belstler Decl., Ex. C. Twin Cities Pride and its Pride Festival simply cannot function—practically or financially—if the Park Board is not ordered to assist Twin Cities Pride in stopping unauthorized organizations or individuals (de facto exhibitors) who attempt to distribute written or tangible material and display signage outside of an approved booth.

A weighing of the relative harms therefore weighs in favor of Plaintiff on the second *Dataphase* prong.

**C.      Plaintiffs Are Likely to Succeed on the Merits.**

Under the third *Dataphase* factor, the party moving for injunctive relief must make a showing that it is likely to succeed on the merits. *See Dataphase*, 640 F. 2d at 114. To obtain injunctive relief, the moving party need demonstrate only that it has a fair chance of prevailing on the merits of its claim. *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003); *see also Glenwood Bridge*, 940 F.2d at 371 (noting that in considering the likelihood of a moving party prevailing on the merits does not entail who "will ultimately win"). What is relevant is whether there is "support for its position in governing law." *McLeodUSA*, 361 F. Supp. 2d at 920. The governing law supports Plaintiff's position.

1.   **The Park Board's Action in Forcing Twin Cities Pride to Accommodate and Sponsor Messages Directly Contrary to its Own is Unconstitutional.**

The United States Supreme Court's decision in *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Group of Boston, Inc.* is controlling. 515 U.S. 557, 115 S. Ct. 2338, 132 L.Ed.2d 487 (1995). In *Hurley*, the Supreme Court held that a private organizational speaker holding a permit to use a public street for expressive purposes could not be forced by a governmental entity to include a group imparting a message that the organizers did not wish to convey.

The parallels between this case and *Hurley* are unmistakable. Here, as in *Hurley*, the governing state entity resolves competing uses of a public space through a system of permits allowing for the orderly and peaceful expression of diverse ideas. *Id.* at 560-61. As in *Hurley*, Twin Cities Pride is a private organization seeking a permit to use a space otherwise generally available to the public. *Id.* at 560. As in *Hurley*, the activity for which the permit is sought is unquestionably an expressive one, enjoying the full protection of the First Amendment. *Id.* at 568-69. A festival devoted to celebrating and advancing a particular message is as expressive as a parade. *U.S. Western Falun Dafa Assn v. Chinese Chamber of Commerce*, 77 Cal.Rptr.3d 710, 718 (2008) ("The expressive nature of [the street fair] is similar, if not identical, to that of the parade in *Hurley*, and merits First Amendment protection.").

As in *Hurley*, a separate speaker whose own speech enjoys First Amendment protection seeks to become an *active participant* (de facto exhibitor) in the expressive activity (in *Hurley*, by entering as a parade contingent; here, by entering as a Festival

exhibitor) to advance a message contrary to the message of the permit holder. *Hurley,* 515 U.S. at 570. As in *Hurley*, the contrary speaker applied for and was denied permission by the permit holder to become an active participant in the expressive activity. *Id.* at 561.

As in *Hurley*, the permit holder does not seek to exclude the contrary speaker as an individual spectator or attendee on any impermissibly discriminatory basis. *Id.* at 572. As in *Hurley*, the contrary speaker's presence would likely be perceived as resulting from the organizers' judgment that his message was "worthy of presentation" inside the festival either as part of a range of acceptable views about homosexuality or as part of a liberal toleration of dissenting opinion. *Id.* at 575. As in *Hurley*, it is impractical for the permit holder to disavow the message of a contrary speaker who is given full access to move through the wide permit area. *Id.* 575-76.

As in *Hurley*, the size and success of the organizers' event makes it "an enviable vehicle for the dissemination of opposing views." *Id.* at 578-79. As in *Hurley*, the contrary speaker is free to seek his own permit to advance his beliefs (and pay associated fees) or engage in other First Amendment activity that does not infringe on the constitutionally protected messages of others. *Id.* at 579.

One way that Twin Cities Pride advances the message of the Pride Festival is to require vendors to sign a non-discrimination statement. This allows Twin Cities Pride to identify (via the assigned booth location) and control messages contrary to its own if they are expressed in the manner of an exhibitor (distributing literature and displaying signage) or if they become harassing or unwelcome to spectators. Twin Cities Pride thus

requires exhibitors—as opposed to mere attendees or spectators—not to conflict with its core message. Indeed, organizations and individuals renting booths were listed in the Twin Cities Pride Annual Report as "Pride Season Supporters."  Belstler Decl. at ¶ 5. *See also, Hurley,* 515 U.S. 574 ("Rather like a composer, the Council selects the expressive units of the parade from potential participants, and though the score may not produce a particularized message, each contingent's expression in the Council's eyes comports with what merits celebration on that day.").

Twin Cities Pride is not asking the Park Board or this Court to act unconstitutionally: it is not asking to bar Brian Johnson, or anyone from the Pride Festival. It is requesting this Court to order the Park Board to support and assist Twin Cities Pride, the permit holder for Loring Park (including its internal and perimeter pathways) in prohibiting the distribution of written or tangible materials and the display of signage by organizations or individuals that are not authorized to do so and have not paid for the privilege of doing so—including Brian Johnson.

Twin Cities Pride is asking this Court to require that the Park Board follow a clear, content-neutral principle: private organizations that obtain a permit to use the park may themselves limit or exclude messages they do not want to convey. The content discrimination thus comes from the private speaker who holds the permit, not from the governmental entity. This content-neutral approach allows a permit-holding black civil rights group, for example, to exclude Ku Klux Klan members in full regalia from a festival honoring Black History Month. It would allow a permit-holding Jewish group to prohibit the display of swastikas during a memorial service for Holocaust survivors.

And it would allow a permit-holding preacher and his family to limit singing by the Twin

Cities Gay Men's Chorus during an Anti-Pride Festival. *See, e.g., Sistrunk v. City of*

*Strongsville*, 99 F.3d 194, 200 (6th Cir. 1996) (holding private organizers of political

rally with city permit to use town commons may exclude persons wearing buttons and

holding signs for opposing candidate); *New York County Bd. of Ancient Order of*

*Hibernians v. Dinkins*, 814 F. Supp. 358, 369 (S.D.N.Y. 1993) (upholding exclusion of

lesbian and gay organization in sponsor's parade). The purpose of a permit process is to

prohibit the Park Board from resolving conflicts in the messages of permit-holders and

contrary speakers by forcing the paid permit-holder to simultaneously carry, promote,

and even subsidize the active messaging of the contrary speaker. By granting the

proposed order, even on a temporary, emergency basis, this Court (and the Park Board,

which has repeatedly said it would obey any court order) would be recognizing and

supporting the freedom of all groups to promote their messages by paying for a permit for

a limited time and in a limited space and prohibiting those who seek to become de facto

exhibitors by distributing their written materials literature and displaying their signs,

thereby contradicting the message of the permit-holder.

> **2.      Twin Cities Pride Has a Use Permit to Hold the Pride Festival in
> Loring Park.**

In its letter to the Park Board, Mr. Johnson cited to *Parks v. City of Columbus* to

support his claim for access to Loring Park. *Parks v. City of Columbus*, 395 F.3d 643,

654-55 (6th Cir. 2005) (holding city could not prevent plaintiff, who attended a permitted

Arts Festival, from walking through the festival grounds wearing a sign bearing a

religious message). This case is inapposite for three main reasons. First, the Park Board

has historically issued an exclusive-use permit to Twin Cities Pride. The Permit describes

"Loring Park" as the "facility" that Twin Cities Pride pays to use for the Pride Festival;

there is no limiting language as to certain areas of the park. In addition, the Park Board

and the Minneapolis Police Department have interpreted the prior permit to be for the

exclusive use of Loring Park. For example, in 2009, the Minneapolis Police Department

ejected Mr. Johnson from the park precisely because he came to the park with a message

opposed to that of the Pride Festival and distributed materials outside of a booth. Kelley

Decl., ¶8. By contrast, the use permit in *Parks* was non-exclusive. *Id.* at 652.

Second, the anti-gay message of Mr. Johnson conveyed in the manner of a de facto

exhibitor would interfere with the core mission and message of the Pride Festival: to be

affirming to the GLBT community. In *Parks*, the religious message of the contrary

speaker did not interfere with the non-expressive purpose of the permit-holder simply to

put on an arts festival. *Id.* Therefore, a preacher who wants to get access to the Uptown

Art Fair to express his anti-gay religious views by walking up and down the

thoroughfares wearing signs and distributing literature would presumably not interfere

with the non-expressive purpose of that fair to sell and display arts and crafts. That same

preacher is not permitted to make himself an exhibitor at a festival with a pro-gay

expressive message, and held on grounds and during times for which the group has paid

for a permit. Therefore, while the Nazi party may get a permit to march through the

streets of Skokie, Illinois, they have no "right" to set up a booth in a forum reserved and

paid for by Holocaust survivors. The Ku Klux Klan may obtain a permit to march

down Hennepin Avenue or to hold a Festival of White Supremacy in Loring Park, but they have no "right" to become an exhibitor at a celebration of Black History organized by a group that has paid for the use of the space and lawfully obtained a permit. *See, e.g., Diener v. Reed*, 77 Fed. Appx. 601, 611 (3d Cir. 2003) (upholding arrest of anti-gay protestors who protested at gay festivals, entered gay festival permit grounds, and disrupted ceremonies at the national civil war museum); *UAW, Local 5285 v. Gaston Festivals*, 43 F.3d 902, 911 (4th Cir. 1995) ("If a party obtaining a permit to use public property for a specific event were constitutionally required to admit unconditionally everyone seeking admission, it would be virtually impossible to hold the event for which the permit was obtained."); *Bolinske v. North Dakota State Fair Ass'n*, 522 N.W.2d 426, 432 (N.D. 1994) (upholding state fair association's refusal to allow plaintiff to circulate petitions at fair: "When public property is being used for a specific purpose, theme, or event, individualized First Amendment expression is often subject to limitation and regulation to accommodate the purpose or objective of the event."); *Capital Area Right to Life, Inc. v. Downtown Frankfort, Inc.*, 862 S.W.2d 297, 301 (Ky. 1993) (upholding revitalization organization's decision to refuse to allow antiabortion group to maintain informational booth at festival).

Third, Twin Cities Pride does not seek "unfettered discretion" to exclude anyone from the Festival "on any grounds," unlike the organizers in *Gathright v. City of Portland*, 439 F.3d 573, 577 (9th Cir. 2006). Contrary to the assertion of the Park Board, Twin Cities Pride does not seek to exclude anyone merely for being present at the Festival. It does not seek to exclude anyone who simply disagrees with the message of

the Festival. It does not even seek to exclude those who simply discuss their contrary views with others.

Instead, it seeks to exclude unauthorized organizations or individuals who (1) become de facto exhibitors by distributing written or tangible anti-gay material and displaying anti-gay signs; (2) will, by their unauthorized literature distribution, undermine the system of vendor and exhibitor guidelines that helps the Pride Festival make it logistically and financially possible to hold an annual event; and (3) will, by their unauthorized literature distribution, present practical difficulties of crowd management, pedestrian traffic flow, littering, and added cost not reimbursed to the Pride Festival.

Although Twin Cities Pride is a nongovernmental entity, the vendor and exhibitor guidelines are consistent with long-established principles that apply to Minnesota governmental entities. *See Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S. Ct. 2559 (1981) (holding enforcement of Minnesota State Fair rule, prohibiting sale or distribution on fair grounds of any merchandise including printed or written material except from a fixed location in a rented booth, did not violate First Amendment).

**D.   The Public Interest Weighs in Favor of Issuing the Temporary Restraining Order.**

The public interest will best be served by granting the temporary restraining order. The public interest is not served by allowing persons to become active participants in the message of a special event reserved for an expressive purpose.

The danger of diluting and diminishing the protected expression of Twin Cities Pride is large. The people attending the Pride Festival may falsely perceive that anti-gay signage and literature by a de facto exhibitor are part of some message that there is a spectrum of views about homosexuality that Festival organizers find acceptable at a Pride Festival, when in fact they do not. Attendees may mistakenly believe that, at an otherwise tightly controlled event, the anti-gay exhibitors are authorized participants reflecting, say, liberal tolerance of dissenting views.

While Festival organizers certainly agree that a broad array of views about homosexuality should be protected by the First Amendment, they do not believe that the principle of tolerance of these views requires them to sponsor and subsidize all such views at their own event. It is not practical to have Twin Cities Pride personnel follow Mr. Johnson and others around with signs disclaiming their message. Because this is a free event held in a park, there are no "official entrances" to the Pride Festival. Thus, any posted signs at the entrances to the Pride Festival may be unclear or easily missed by attendees eager to enter the festivities through a wide area of open park space. Plus, having attendees stop to read disclaimers at common entrances would itself risk an impediment to crowd control and pedestrian traffic.

At the same time, the imposition on Mr. Johnson's anti-gay message is small. He will personally be able to attend the festival, subject to the city and state laws and park regulations that apply to all attendees. If he prefers to distribute anti-gay literature and brandish anti-gay signage, he may do so outside of the permit area and even within the permit area at times not covered by the permit.

He may, of course, also seek a permit to hold an Anti-Pride Festival in Loring Park. Like Twin Cities Pride, he can pay tens of thousands of dollars for such a permit, provide security, maintain liability insurance, clean up any litter, and turn over a portion of any proceeds to the Park Board. Mr. Johnson, in short, should receive the same First Amendment protection—and bear the same obligations for public safety—that Twin Cities Pride has borne since 1972. He may exclude persons with messages supporting the equal dignity and equality of GLBT people if they seek to become de facto exhibitors in his anti-gay expression by displaying contrary signage and distributing contrary literature. He has no less—and no more—entitlement than Twin Cities Pride to constitutional protection for his anti-gay message.

Finally, the new rule announced by the Park Board allowing Johnson to distribute literature outside the vendor booths will not be limited to him. If Twin Cities Pride may not prohibit distribution of literature outside of vendor booths by him, on what basis could it prohibit distribution by others? And if it cannot prohibit distribution by others, it must bear the costs, both in terms of cleanup and in terms of the dilution of its own message.

In short, the equities weigh heavily in favor of ordering the Park Board to reverse itself and assist and support Twin Cities Pride in stopping the unauthorized distribution of written or tangible material and displays of signage that will eliminate Twin Cities Pride's ability to control its expression of the message of Pride within the permit grounds and its ability to make the Pride Festival successful, enjoyable, and meaningful to all attendees.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant

Plaintiffs' motion for a temporary restraining order in accordance with their Proposed

Order.

DATED: June 23, 2010          **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

By: _____
Amy E. Slusser, #387375

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Telephone: 612-349-8500

-and-

**EILEEN SCALLEN,** #191450
875 Summit Avenue
St. Paul, MN 55104-3076
Telephone: 651-290-6323

**ATTORNEYS FOR PLAINTIFF
GAY-LESBIAN-BISEXUAL-TRANSGENDER
PRIDE/TWIN CITIES, D/B/A TWIN CITIES
PRIDE**