# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| GAY-LESBIAN-BISEXUAL-TRANSGENDER PRIDE/TWIN CITIES, *doing business as* Twin Cities Pride, | Civil No. 10-2579 (JRT/JJG) |
| Plaintiff, | |
| v. | **ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER** |
| MINNEAPOLIS PARK AND RECREATION BOARD, | |
| Defendant, | |
| and | |
| BRIAN JOHNSON, | |
| Intervenor. | |

Amy E. Slusser, **ROBINS KAPLAN MILLER & CIRESI LLP**, 800 LaSalle Avenue, Suite 2800; and Eileen Scallen, **WILLIAM MITCHELL COLLEGE OF LAW**, 875 Summit Avenue, Saint Paul, Minnesota 55105, for plaintiff.

Michael J. Salchert, Brian F. Rice, and Ann E. Walther, **RICE, MICHELS & WALTHER LLP**, 10 Second Street NE, Suite 206, Minneapolis, MN 55412, for defendant.

Nathan W. Kellum and Jonathan Scruggs, **ALLIANCE DEFENSE FUND**, 699 Oakleaf Office Lane, Suite 107, Memphis, TN 38117; and Mark W. Peterson, **MARK W. PETERSON LAW OFFICE**, 5200 Willson Road, Suite 150, Edina, MN 55424 , for intervenor.

On June 23, 2010, Plaintiff Gay-Lesbian-Bisexual-Transgender Pride/Twin Cities

d/b/a/ Twin Cities Pride ("Twin Cities Pride") brought this action pursuant to 42 U.S.C.

§ 1983 against defendant Minneapolis Park and Recreation Board ("MPRB"), alleging

violations of its First Amendment right to free speech, petition, and assembly.  On the same date, Twin Cities Pride filed a motion for a temporary restraining order.  For the reasons set forth below, the Court denies the motion.

## BACKGROUND

Twin Cities Pride is a nonprofit 501(c)(3) organization based in Minneapolis, Minnesota.  (Belstler Decl. ¶ 2, Docket No. 6.)  Twin Cities Pride, which is comprised almost entirely of volunteers, produces the annual Pride Celebration in Minneapolis and St. Paul, Minnesota.  (*Id.*)  Twin Cities Pride asserts that its mission is "to commemorate and celebrate our diverse heritage, inspire the achievement of equality and challenge discrimination."  (*Id.* (internal quotation marks omitted).)  The Minneapolis Park and Recreation Board of Commissioners is "an independently elected, semi-autonomous body responsible for maintaining and developing the Minneapolis Park system to meet the needs of citizens of Minneapolis."  (Slusser Decl. Ex. D., Docket No. 5.)  Among other things, MPRB issues permits to the public for events including "picnics," "weddings," "reception[s] and part[ies]," and other "special events" on park property.  (*Id.* Ex. E.)

Twin Cities Pride's annual Pride Celebration consists of several events, including a two-day Pride Festival that is traditionally held the last full weekend of June.  Twin Cities Pride has held the Pride Festival in Minneapolis' Loring Park for thirty-two of the thirty-seven years in which the Pride Festival has been held.  (Belstler Decl. ¶ 3, Docket No. 6.)  "Loring Park consists of forty-two acres of land in a densely populated part of

[Minneapolis]. . . . [and] is accessible on all sides and there are no physical barriers to prevent access to the Park." (Stenzel Aff. ¶ 2, Docket No. 12.)

Each year, Twin Cities Pride applies to MPRB for a special use permit to hold the Pride Festival in Loring Park.  On January 16, 2010, Twin Cities Pride applied for a special use permit (the "Permit') from MPRB to hold a portion of the 2010 Pride Festival in Loring Park on June 25, 26, and 27.  (Stenzel Aff. ¶ 3, Docket No. 12.)  MPRB issued a tentative permit to Twin Cities Pride which enumerates several conditions.  MPRB's permit application provides: "[a]ll events and applicant's guests, vendors, concessionaires and exhibitors are subject to and must abide by the codes, rules, regulations, ordinances, statutes, and laws of the MPRB, the City of Minneapolis, the State of Minnesota, and the United States of America."  (Stenzel Aff. Ex. A, Docket No. 12.)  The "Permit does not grant [Twin Cities Pride] exclusive control of Loring Park."  (*Id.* ¶ 5.)  The Permit allows Twin Cities Pride to use Loring Park and the Loring Park Bandshell for the Pride Festival and to set up a "beer garden," three stages for entertainment, three food courts, and various vendor booths.  (Stenzel Aff. Ex. B, Docket No. 12.)  The Permit also caps the attendance for the two-day event at 300,000 people and requires Twin Cities Pride to employ three MPRB police officers during the event.  (*Id.* ¶¶ 6-7, Ex. B.)  Pursuant to the Permit's conditions, Twin Cities Pride is responsible for litter removal and cleanup and for providing insurance for the Festival grounds.  (Belstler Decl. ¶ 9, Docket No. 6.)  The Permit also requires Twin Cities Pride to remit a percentage of revenues from food and beverage sales to MPRB.  (*Id.*)

Twin Cities Pride represents that the Pride Festival attracts over 200,000 visitors each year.  (Belstler Decl. ¶ 4, Docket No. 6.)  The Pride Festival also consists of several "official participants," which Twin Cities Pride divides up into three categories: sponsors, who receive booth space and permission to advertise with signage and other advertisements in exchange for in-kind or financial support; vendors, who sell products or solicit donations; and exhibitors, who may display information about their organization or cause and distribute written materials or souvenirs.  (*Id.* ¶ 5.)  Twin Cities Pride requires all categories of official participants to sign and affirm a non-discrimination statement that states:

> The Applicant affirms that they and/or their business/organization do not discriminate in hiring, employment, participation or services rendered based on the fact or perception of a person's race, color, creed, religion, national origin, ancestry, age, sex, sexual orientation, gender identity, domestic partner status, marital status, disability, or Acquired Immune Deficiency Syndrome or HIV Status.

(Belstler Decl. Ex. A, Docket No. 6.)

All official participants must adhere to a set of rules developed and published by Twin Cities Pride.   (Compl. ¶ 17, Docket No. 1.)   These rules direct all official participants as follows: "[y]ou must limit your activities at the Festival to those you state on your application, which must pertain to your organization/business.  You must also limit the conduct of those activities to your booth space(s).  **Sales or distribution of anything done by walking through the Festival grounds is not permitted.**" (Belstler Decl. Ex. A, Docket No. 6.)  Twin Cities Pride cites three reasons for placing these restrictions on activities outside of official booths: the restrictions "prevent littering" by

"limiting distribution of written and tangible materials," "assist[] in crowd safety and control . . . . [by ensuring] that the traffic flow of attendees is as smooth as possible," and allow Twin Cities Pride to continue to collect booth fees.  (Pl.'s Mem. in Supp. of Mot. for Temporary Restraining Order at 8-9, Docket No. 3.)

Brian Johnson is an evangelical Christian who "expresses his religious beliefs by engaging in conversation and distributing Bibles."[1]  (Mem. in Supp. of Mot. to Intervene and in Opp'n to Mot. for TRO at 2, Docket No. 16.)  Johnson and his family operated a vendor booth at the Pride Festival for several years prior to 2009.  (Def.'s Mem. in Opp'n at 3, Docket No. 11.)  In 2009, Twin Cities Pride denied Johnson's application for a booth, citing complaints from past festival attendees.  (Kelley Decl. ¶ 6, Docket No. 4.) The manager of the Pride Festival stated that Johnson's "message and purpose . . . contradicted our Pride Festival's . . . message of celebration and pride in being gay, lesbian, bisexual or transgender."  (*Id.*)  Regardless, Johnson attended the 2009 festival with "several boxes of written material."  (*Id.* ¶ 8.)  After he refused to leave the area, the Minneapolis Police Department arrested and removed him from the park.  (*Id.*)  In 2010, Twin Cities Pride again denied Johnson's application for a booth based on "his history of disruption, and because his anti-gay opinion was antithetical to the Pride Festival's purpose and message."  (Compl. ¶ 33, Docket No. 1.)

---

[1]   At the hearing on the motion for a temporary restraining order, the Court granted Johnson's motion for permissive intervention under Rule 24 of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 24(b) ("[T]he court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact.").

On April 5, 2010, the Alliance Defense Fund ("ADF") sent a letter to MPRB on behalf of Johnson, demanding he be allowed to enter Loring Park during the Pride Festival to speak, distribute literature, and display signs.  (Def.'s Mem. in Opp'n at 3, Docket No. 11.)   On April 26, 2010, MPRB responded, stating that it "will not prevent [Johnson] from entering Loring Park . . . to distribute literature, display signs, and speak to members of the public."  (Salchert Decl. Ex. B, Docket No. 13.)  MPRB also stated that it "intend[s] to preserve the orderly movement of people and provide for the safety and convenience of the general public during the Festival."  (*Id.* Ex. C.)

On June 23, 2010, Twin Cities Pride filed this action pursuant to 42 U.S.C. § 1983.  It alleges that by "allow[ing] Mr. Johnson to express his views as part of the Pride Festival, [Twin Cities Pride] faces an actual and concrete threat of imminent future violation of its First Amendment free speech, assembly, and petition rights." (Compl. ¶ 41, Docket No. 1.)  Twin Cities Pride claims irreparable injury because their staff would not be able to "ensure [Johnson] is not personally littering," would likely be unable "to collect a cleaning fee from him," and because "allowing Mr. Johnson the right to distribute materials outside of a booth deprives Twin Cities Pride of the application fee it uses to defray the significant costs of obtaining a Permit."  (Pl.'s Mem. in Supp. of Mot. for TRO at 13-14, Docket No. 3.)   Twin Cities Pride asks for a temporary restraining order and a preliminary injunction ordering MPRB to "prohibit[] any person or organization from distributing written materials or tangible objects outside of an authorized exhibitor or vendor booth," and to "prohibit all signage not authorized by Twin Cities Pride."  (Compl. at 10, Docket No. 1.)

**DISCUSSION**

In determining whether a party is entitled to preliminary injunctive relief, the Court considers "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).  "The question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.*  "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, at 129-30 (2d. ed. 1995)).

Twin Cities Pride alleges violations of its right "to define and limit the content of its actual and symbolic speech" as protected by the First and Fourteenth Amendments. Twin Cities Pride argues that the MPRB "cannot . . . force[ Twin Cities Pride] to include a de facto exhibitor who distributes literature at the Pride Festival, especially one whose message is antithetical to Twin Cities Pride's own message within the boundaries during the times in which Twin Cities Pride has obtained a permit to express its views."  (Pl.'s Mem. in Supp. of Mot. for a TRO at 3, Docket No. 3.)  Twin Cities Pride claims that MPRB "failed in its public duty to protect Twin Cities Pride's First Amendment rights to

control who can be a sponsor, exhibitor, or vendor in the Pride Festival – whether officially or de facto." (*Id.* at 12.)

"In the context of First Amendment cases, courts normally assume irreparable injury because '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Wickersham v. City of Columbia*, 371 F. Supp. 2d 1061, 1075 (W.D. Mo. 2005) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). A party may thus establish irreparable harm "[i]f they are correct and their First Amendment rights have been violated." *Marcus v. Iowa Public Television*, 97 F.3d 1137, 1140 (8th Cir. 1996). As a consequence, the Court focuses its analysis on whether Twin Cities Pride has established a likelihood of success on the merits of its constitutional claims.

Twin Cities Pride's request for injunctive relief presents the Court with the challenge of attempting to reconcile Twin Cities Pride's and Johnson's competing First Amendment rights. The Court first addresses Twin Cities Pride's claim that it is entitled to restrict Johnson's First Amendment-protected activities on the Pride Festival grounds. The Court then turns to the question of whether MPRB may lawfully limit Johnson's distribution of literature and display of signage as requested in the motion for a temporary restraining order. After reviewing the parties' briefs and arguments at the hearing on this motion, the Court concludes that Twin Cities Pride may not restrict Johnson's exercise of First Amendment rights to hand out written literature or display certain signage. The Court also concludes that Twin Cities Pride's proposed injunctive relief mandates MPRB restrictions that are not narrowly tailored to further a significant governmental interest.

## I.    TWIN CITIES PRIDE'S FIRST AMENDMENT RIGHTS

Twin Cities Pride relies on the Supreme Court's holding in *Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995), to support its argument that it is likely to succeed on the merits.   In *Hurley*, the Massachusetts state courts interpreted a Massachusetts public accommodations law to require the South Boston Allied War Veterans Council – a private group that organized a St. Patrick's Day parade and obtained a permit from the city to do so – to include in its annual parade marchers from GLIB, an organization of openly gay, lesbian, and bisexual individuals of Irish heritage.  *Id.* at 563.  The Supreme Judicial Court of Massachusetts affirmed, and the United States Supreme Court granted certiorari "to determine whether the requirement to admit a parade contingent expressing a message not of the private organizers' own choosing violates the First Amendment." *Id.* at 566.

The Supreme Court held that by compelling the Council to include GLIB, whose message the Council did not agree with, the state court "essentially require[d] [the Council] to alter the expressive content of their parade." *Id.* at 572-73.  The Supreme Court further held that "th[e] use of the State's power violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.* at 573; *see also id.* at 575 ("[T]he presence of the organized marchers would suggest their view that people of their sexual orientations have as much claim to unqualified social acceptance as heterosexuals and indeed as members of parade units organized around other identifying characteristics.").  The Supreme Court

noted that "this general rule, that the speaker has a right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but **equally to statements of fact the speaker would rather avoid**." *Id.* at 573 (emphasis added).  The Supreme Court concluded: "when dissemination of a view contrary to one's own is forced upon a speaker intimately connected with the communication advanced, the speaker's right to autonomy over the message is compromised." *Id.* at 576.

Twin Cities Pride contends that the instant case is on parallel with *Hurley*, where it claims that the Supreme Court "held that a private organizational speaker holding a permit to use a public street for expressive purposes could not be forced by a governmental entity to include a group imparting a message that the organizers did not wish to convey."  (Pl.'s Mem. in Supp. of Mot. for TRO at 19, Docket No. 3.)  Twin Cities Pride contends that in the instant case, "[a]s in *Hurley*, a separate speaker whose own speech enjoys First Amendment protection seeks to become an *active participant* (de facto exhibitor) in the expressive activity (in *Hurley*, by entering as a parade contingent; here, by entering as a Festival exhibitor) to advance a message contrary to the message of the permit holder." (*Id.* at 19-20.)

Twin Cities Pride's request for injunctive relief, however, asks the Court to afford *Hurley* an overly expansive interpretation.  In *Hurley*, the Supreme Court "disallowed compelled, participatory speech, noting that 'like a composer, the [parade organizers] select[] the expressive units of the parade from potential participants, and though the score may not produce a particularized message, each contingent's expression in [their] eyes comports with what merits celebration on that day.'"  *Startzell v. City of*

*Philadelphia*, 533 F.3d 183, 194 (3d Cir. 2008) (quoting *Hurley*, 515 U.S. at 574) (alterations in original).  Notably, the parties do not dispute that under *Hurley*, Twin Cities Pride was entitled to deny Johnson's application to obtain a booth at the Pride Festival as an exhibitor.  But Twin Cities Pride further seeks the MPRB's assistance in limiting Johnson's speech or expression as an attendee or spectator at the festival.

The Third Circuit addressed similar facts in *Startzell v. City of Philadelphia*, in which an organization, Philly Pride Presents, Inc. ("Philly Pride"), organized an event known as "OutFest" "to celebrate 'National Coming Out Day' on behalf of the lesbian, gay, bisexual and transgendered community." *Startzell*, 533 F.3d at 188.  Philly Pride "obtained a permit from the City of Philadelphia to close off the streets in which OutFest took place." *Id.* at 189.  Prior to the commencement of OutFest, members of a counter-protester group known as "Repent America" – who believe "it is their duty to God to warn others about the destructiveness of sin through public proclamation of the gospel of Jesus Christ" – publicly represented that they intended to interfere with the events during OutFest even if it "mean[t] breaking the law." *Id.* at 189.  In response, Philly Pride requested that "the City uphold Philly Pride's First Amendment rights to determine and maintain the expressive content of its own event . . . [by] keep[ing] anti-LGBT protesters from accessing the permitted city blocks of the party during the hours specified on the permits issued." *Id.* at 189-90.  The City rejected Philly Pride's requests. *Id.* at 190.  On the day that OutFest commenced, protesters from Repent America arrived with bullhorns, large signs, and literature. *Id.*  After using the bullhorns, singing loudly, and displaying large signs approximately twenty yards away from OutFest's main stage, police asked the

protesters to move their demonstration away from the main stage.  *Id.* at 190-91.  The protesters refused, and police arrested the protesters for disorderly conduct and for refusing to obey police orders.  *Id.* at 191.  The protesters sued the City, and the district court granted the City's motion for summary judgment on the protesters' First Amendment claims.  *Id.* at 191-92.  The Third Circuit affirmed, holding that "the City's actions in restricting [the protesters'] movement when they were interfering with or disrupting the speech of the permitted event were justified, reasonable, content-neutral regulations of the time, place, or manner of their expression."  *Id.* at 203.

Prior to reaching its holding, the Third Circuit took care to outline the protesters' First Amendment rights in the context of the protesters' attendance at OutFest. Distinguishing the facts from *Hurley*, the Third Circuit determined that "[t]he situation in *Hurley* would be comparable to that presented here if Repent America had sought a stage area or a vendor booth, because such participation in OutFest would likely be perceived as having resulted from [Philly Pride's] customary determination about a unit admitted to [participate in OutFest's activities], that its message was worthy of presentation and quite possibly of support as well.'"  *Id.* at 194 (internal quotation marks omitted; alterations in original).  Instead, the pertinent question for the Third Circuit was "whether *Hurley* authorizes exclusion of [the protesters] from attending OutFest, a private-sponsored event in a public forum that was free and open to the general public."  *Id.*  The Third Circuit held that "[t]here is no basis to read *Hurley* as circumscribing the long line of authority upholding free access by the general public to street festivals and other events held in traditional public fora."  *Id.* at 195.

Similarly, the issue presented to the Court here is whether *Hurley* authorizes state actors – MPRB police – to preclude Johnson from distributing literature, wearing signage conveying his message, and taking surveys on the Pride Festival grounds in Loring Park. The Court concludes that the MPRB police may not do so.

Johnson will not be an official participant – a sponsor, a vendor, or an exhibitor – at the Pride Festival.  Twin Cities Pride suggests that by distributing written materials or tangible products, by displaying signage, or by taking surveys, Johnson would become a "de facto exhibitor."   The Court disagrees.   Twin Cities Pride concedes that Johnson's "message is diametrically opposed to the message of the Pride Festival."  (Pl.'s Mem. in Supp. of Mot. for TRO at 10-11, Docket No. 3.)  Assuming that Johnson attends the Pride Festival and conveys such a dissenting message, the Court finds that "[t]here [would be] no danger of confusion that [Johnson's] speech would be confused with the message intended by [Twin Cities Pride]."   *See Startzell*, 533 F.3d at 196; *see also Gathright v. City of Portland*, 439 F.3d 573, 578 (9th Cir. 2006) ("*Hurley* does not, by its own terms, extend to these circumstances, where a speaker in a public forum seeks only to be heard, not to have his speech included or possibly confused with another's[.]").  As a result, the Court finds that *Hurley* does not apply, and the Court turns to the consideration of whether the proposed temporary restraining order would require MPRB to unlawfully limit Johnson's First Amendment rights.

**II.     WHETHER MPRB MAY LIMIT JOHNSON'S FREEDOM OF EXPRESSION IN A PUBLIC FORUM**

The Court next considers whether it may order the MPRB to limit Johnson's First Amendment rights to distribute literature or other tangible materials or to display signage at the Pride Festival as an attendee.  In considering whether MPRB may limit Johnson's activities at the Pride Festival, the Court considers (1) whether the speech is "protected by the First Amendment"; (2) "the nature of the forum"; and (3) whether the government's "justifications for exclusion from the relevant forum satisfy the requisite standard."  *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).  The parties do not dispute that Johnson's proposed activity – distributing literature or displaying signage – is protected by the First Amendment.

As to the second factor, the Court concludes that Loring Park is a public forum, notwithstanding MPRB's issuance of a permit to Twin Cities Pride.  "Streets, sidewalks, **parks**, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely."  *Carey v. Brown*, 447 U.S. 455, 460 (1980) (internal quotation marks, alterations, and citations omitted; emphasis added).  Loring Park, like the streets and sidewalks of Philadelphia, is "an undisputed quintessential public forum."  *Startzell*, 533 F.3d at 196.  MPRB's issuance of a permit to Twin Cities Pride to use Loring Park for the Pride Festival "does not transform its status as a public forum."  *Id.* at 196; *cf. United States v. Grace*, 461 U.S. 171, 180 (1983)

("Congress . . . may not by its own *ipse dixit* destroy the 'public forum' status of streets and parks which have historically been public forums." (alteration in original)).

As discussed further above, courts have rejected the argument that a permit to use a public area affords the permit holder the right to restrict attendees' speech. MPRB concedes that under some circumstances, it may intervene and regulate the First Amendment activities of Pride Festival attendees. That is, in a traditional public forum, MPRB

> may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

*Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotation marks omitted).

To the extent that the Court were to conclude that Twin Cities Pride seeks MPRB's assistance in restricting content-neutral (as opposed to content-based) expression – an issue this Court does not reach here – Twin Cities Pride has not demonstrated that such restrictions would be narrowly tailored to serve a significant governmental interest. Twin Cities Pride identifies three interests that would be served by restricting Johnson's or other attendees' rights to distribute literature. Twin Cities Pride claims that the limitations that they place on sponsors, exhibitors, and vendors help prevent littering, for which Twin Cities Pride is responsible for cleaning up; assist with crowd safety and control by managing traffic flow; and ensure that Twin Cities Pride can

accrue revenue to support its mission.  The third purpose – ensuring Twin Cities Pride's revenue flow – is not a significant governmental interest.

Although the government could conceivably have a significant interest in preventing littering, *see Krantz v. City of Fort Smith*, 160 F.3d 1214, 1219-20 (8th Cir. 1998), the Court is not persuaded that the interest in the cleanliness of Loring Park justifies ordering MPRB to prohibit the distribution of First Amendment-protected materials during the Pride Festival.  *Cf. Schneider v. New Jersey*, 308 U.S. 147, 163 (1939) ("[T]he public convenience in respect of cleanliness of the streets does not justify an exertion of the police power which invades the free communication of information and opinion secured by the Constitution.").  The interest in ensuring crowd safety and crowd control may also constitute a significant governmental interest.  MPRB's wholesale exclusion of attendees' ability to distribute literature or display signage, however, would not be narrowly tailored to ensure crowd safety and manage traffic flow.  The Court is particularly reticent to order such sweeping injunctive relief where the context of the prospective distribution of materials or displaying of signs is undetermined and speculative.

The Court's conclusion does not foreclose MPRB's involvement in restricting the exercise of First Amendment rights that may be disruptive or pose a threat to crowd safety.  *See Startzell*, 533 F.3d at 199-200 ("Appellants did not simply carry their signs or distribute leaflets but used loud bullhorns to express their message near the stage area, directly addressed an OutFest attendee in a confrontational manner, and blocked access to the vendor booths.  Because Appellants were interfering with the permitted event's

message, something the other OutFest attendees were not doing, the police officers were justified in directing Appellants' movement away from the stage and the vendors." (citation omitted)).  In fact, MPRB represented to Johnson and ADF that it "does intend to preserve the orderly movement of people and provide for the safety and convenience of the general public during the Festival."  (Slusser Decl. Ex. C, Docket No. 5.)  If Johnson or another attendee's exercise of First Amendment rights affect traffic flow or attendee safety – i.e., by setting up a quasi-"booth" in which other visitors stop and slow crowd movement; by carrying boxes of literature or objects so large that they impact crowd movement; by speaking with amplification or otherwise speaking so loudly that the speech is disruptive to other attendees; or by displaying signage that is so cumbersome as to impede the orderly flow of foot traffic – the Court trusts that MPRB police and other security will be well-prepared to address those issues and stop any disruption.

In sum, Twin Cities Pride has not demonstrated that it is likely to succeed on the merits of its constitutional claims.  Twin Cities Pride has not established that it is entitled as a permit holder to restrict Pride Festival attendees' First Amendment rights to distribute literature or display signage.  Further, the substance of Twin Cities Pride's requested injunctive relief – which would require MPRB police to assist in banning certain forms of First Amendment-protected expression – is not narrowly tailored to serve

a significant government interest.   Accordingly, the Court denies the motion for a temporary restraining order.[2]

The line between legitimate competing interests under the First Amendment is not always easy for the public to discern and even more difficult for a court to draw in advance.   The Court's task here is to balance these competing interests to the greatest extent possible – to enable all speakers to exercise their constitutional rights – and then to depend on reasonable and law-abiding people to stay within the proper limits.   Twin Cities Pride is entitled by virtue of its permit to decide who may be sponsors, exhibitors, and vendors at the Pride Festival and to control its message.   As a festival attendee in a public forum, Johnson is entitled to speak and hand out literature, quintessential activities protected by the First Amendment, so long as he remains undisruptive.   In the Court's view, striking this balance will enable us to "remain[] true to the essence of the First Amendment."   *Startzell*, 533 F.3d at 188.

---

[2] At the close of the hearing, Twin Cities Pride requested guidance from the Court in the event that the Court denied the motion for a temporary restraining order.  Although not raised by the parties in briefing or at oral argument, a compromise may be available.   In theory, Twin Cities Pride could designate "free speech zones" on the Pride Festival grounds in which anyone who wishes to distribute literature or display signage may do so.  *Cf.*, *Roberts v. Haragan*, 346 F. Supp. 2d 853, 868-70 (N.D. Tex. 2004).  MPRB police could enforce that area as a content-neutral restriction – assuming that those free speech zones provide attendees with ample alternative channels of expression, *see Ward*, 491 U.S. at 791, and assuming that oral communication would be permitted throughout the public forum.   Attendees would thus have the opportunity to "reach the minds of willing listeners," s*ee Heffron v. Int'l Soc'y of Krishna Consciousness, Inc.*, 452 U.S. 640, 654-55 (1981) (internal quotation marks omitted), and Twin Cities Pride would have the opportunity to disclaim the content of such expression.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY ORDERED** that:

1.      Plaintiff Twin Cities Pride's Motion for Temporary Restraining Order [Docket No. 2] is **DENIED**.

2.      Intervenor Brian Johnson's Motion to Intervene [Docket No. 15] is **GRANTED**.

DATED:  June 25, 2010                              _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                 United States District Judge